F. H. HOFFMAN et al., Appellants, v. CITY OF MUSCATINE et al., Appellees.

No. 39941.

868

September 26, 1930.

Rehearing Denied June 20, 1931.

Stipp, Perry, Bannister, Starzinger & Little, Nichols, Tipton & Tipton, and G. Allbee, for appellants.

Head, Crafts & Wallace, Kelly, Shuttleworth & McManus, Hanley & Hanley, Frank Drake, C. H. Fishburn, City Attorney, for appellees.

Evans, J.—The petition predicates a charge of fraud mainly upon the fact that the bidding contractor, Warren Brothers Company, was the patentee of the paving mixture, which was to be used in the performance of the contract. Preliminary to a more detailed statement, the salient facts of the case may be stated very briefly.

The City Council of Muscatine proposed to resurface certain defective pavement and established two districts for that purpose. By regular procedure, including notice to bidders, it announced a letting on June 28, 1927. Pursuant to statute the council selected four kinds of material upon which it invited bids: viz., Lake Asphalt; Oil Asphalt; Amesite and Bitulithic. The latter was a patented process of mixture. Warren Brothers Company was the patentee. Prior to June 28, the City procured from the patentee a written offer fixing the price at which it would furnish the patented mixture to any contractor at $1.34 per square yard. At the letting on June 28, there were several bidders. There was only one bid upon the Bitulithic. That

was made by the Central Engineering Company at $1.35 per square yard. The same Company made another bid upon other of the specified materials. The bid of this Company upon the Bitulithic was the lowest bid and it was accepted by the City Council. Thereupon the Central Engineering Company defaulted and refused to enter into contract. Thereupon the City Council readvertised for bids and fixed August 16, for the date of the letting. On such date twelve bids were filed other than the one in controversy here. All these bids were based upon materials other than the Bitulithic. The offer of the patentee on file was renewed, but no bids were predicated thereon. The patentee presented a bid of $1.35, which was the former bid of the Central Engineering Company at the first letting. This was the lowest bid made upon any material and it was again accepted by the City Council and later fully performed by the patentee.

This suit was brought before the performance of the contract; but no temporary injunction was asked. The performance was complete before the case was brought on for trial. These plaintiffs all filed objections to their assessments pursuant to the statute, and such objections were pending at the time of the trial of this suit. The trial court dismissed the injunction proceeding without prejudice to the right of the plaintiffs under their objections before the City Council. The petition herein alleged many irregularities in the procedure followed by the City Council. At the trial, the plaintiff put in evidence the entire record of the procedure and all the documentary evidence pertaining thereto. These claims of irregularity have been abandoned on this appeal and the evidence introduced in the court below in support of the same has not been included in appellant's abstract, here. The question presented to us now is whether the patentee was guilty of fraud in the method of presenting its bid and obtaining the contract.

We proceed therefore to a more detailed consideration of the allegations and of the evidence on the question of fraud.

I. The petition is lengthy and comprises twenty paragraphs and nineteen printed pages. The first twelve paragraphs may be ignored as relating to irregularities not now pressed. The allegations of fraud are contained in paragraphs 13, 14 and 15. The allegations of paragraphs 13 and 14 are substantially re-

peated in paragraph 15, and we set forth such paragraph 15 as presenting the charge of fraud made in the petition.

"Paragraph 15.

"The defendant Warren Brothers Company has been engaged in the business of selling its patented pavement to cities and towns in the State of Iowa for many years; that it has a regular and long established method of conducting its business with the cities and towns and contractors in the State of Iowa; that its said method of conducting its business is well known among contractors and others with whom it has dealt during its operations in the State of Iowa; that its said method of conducting its business with the cities and towns in the State of Iowa is as follows, to wit:

"When a municipality advertises for bids for the construction of paving, including Warrenite Bitulithic in the types of paving on which bids will be considered, Warren Brothers Company files with the clerk of the municipality its 'filed agreement' or offer. Said 'filed agreement' provides:

"That Warren Brothers Company as owners of patents on Warrenite Bitulithic pavement, offers to furnish to the municipality or to any contractor to whom the municipality may award a contract for the construction of such pavement, the following:

"1. The right to use said patents.

"2. The Warrenite Bitulithic mixtures for the wearing surface, delivered hot to contractor.

"3. Daily examination of paving materials at Warren Brothers laboratory in Massachusetts.

"Said 'filed agreement' then names a definite price per square yard of finished pavement for which Warren Brothers Company will furnish the foregoing to any contractor to whom the municipality awards a contract.

"But in truth and in fact the filing of said offer by Warren Brothers Company is fraudulent in its purpose and is designed, intended and used by said Warren Brothers Company to prevent competition in the laying of Warrenite Bitulithic paving. At all lettings said Warren Brothers Company have a favored bidder who is not required to pay the price per square yard named in the 'filed agreement' but pays merely a small amount per yard for royalty, the going price for the last several years

to favored contractors in the State of Iowa being twenty-five cents a square yard in lieu of the price named in the 'filed agreement.'

"That said Warren Brothers Company carried out the same method of procedure in connection with the paving improvement at Muscatine involved in this case, and it filed its said customary 'filed agreement' as alleged in Paragraph 13 hereof.

"That under said defendant's method of conducting its business in Iowa and in the proceedings and matters heretofore referred to in this petition, the said fraudulent interference with and prevention of competition in bidding on Warrenite Bitulithic paving is concealed under the provision in said 'filed agreement' which provides as follows:

" 'It is understood that Warren Brothers Company reserves the right to employ the facilities of the successful bidder or of others to produce such mixtures under the supervision of Warren Brothers Company.'

"Warren Brothers do not have and never have had in Iowa the machinery and equipment required to prepare the Warrenite Bitulithic roadway mixtures for the wearing surface. When a contractor favored by Warren Brothers Company is awarded a contract by a municipality, Warren Brothers Company makes a contract with such contractor under which the contractor agrees to perform the work which Warren Brothers Company agrees in its 'filed agreement' to do in preparing the roadway mixtures; and the consideration running from Warren Brothers Company to such contractor for said services in preparing the roadway mixtures is such that it amounts to a very large rebate from the price named in the 'filed agreement' and amounts generally to a mere royalty of twenty-five cents a yard to be paid by the contractor to Warren Brothers Company.

"That said method of conducting its business by Warren Brothers Company prevents any competition among bidders for the laying of Warrenite Bitulithic paving and is a fraud on the municipality which receives bids on Warrenite Bitulithic paving, and on the property owners who are required to pay for said paving. That by reason of Warren Brothers' said method of conducting its business, a valid and legal contract

cannot be made by a municipality for the construction of War-renite-Bitulithic paving.

"That under the proceedings referred to in the petition, bids were first received by the defendant City of Muscatine on or about June 28, 1927. At said bidding the contractor whom Warren Brothers Company desired to protect from competition was not the low bidder and Warren Brothers Company declined to give to the contractor who was low bidder the terms which it customarily gives to its favored bidders but insisted that said contractor who was low bidder must pay the price named by Warren Brothers Company in their said 'filed agreement', being the one referred to in Paragraph 13 hereof. Said filed price was so high that it was cheaper for said low bidder to forfeit to the City his certified bidder's checks aggregating one thousand dollars than to sign contracts with the City for the construction of the improvements bid upon and described in the petition that said low bidder did forfeit his said certified bidder's checks and declined to enter into contracts with the City for the construction of said improvements. That thereafter the City readvertised for bids for said improvements and at said bidding on or about August 16, 1927, said Warren Brothers Company, pursuant to its conspiracy, and plan to prevent competition in bidding on Warrenite Bitulithic paving, filed a bid in its own name in the amount of $1.35 per square yard, which is only one cent a yard in excess of the price demanded in its 'filed agreement' for the part of the construction of said improvements covered by said 'filed agreement' or offer. That one cent a yard is grossly inadequate to cover the cost of constructing said improvements over and above the materials and service offered by Warren Brothers Company to be furnished in its said 'filed agreement'; that said bid of $1.35 per square yard was possible for Warren Brothers Company only because the price of $1.34 per square yard named in its 'filed agreement' was padded for the purpose of eliminating competition.

"That all of the acts alleged herein were done by Warren Brothers Company as a part of a plan and conspiracy entered into by Warren Brothers Company for the purpose of interfering with competition in bidding on the construction of said improvements described in this petition. That said acts of

Warren Brothers Company did deprive the City of Muscatine, and the property owners in said City who will be required to pay the cost of said improvements, of any and all competition in bidding on the construction of said improvements with Warrenite-Bitulithic paving.

"That by reason of the matters and things in this Paragraph alleged the defendant City of Muscatine has no power to enter into contract with defendant Warren Brothers Company referred to in Paragraph 5 hereof."

In juxtaposition to the foregoing voluminous charge, we may bring forward the evidence introduced by the plaintiffs in support of the same. This evidence consists of the testimony of three witnesses, who were competing bidders at the letting. These witnesses were Wright, Fieweger, and Burrows. The testimony of Wright is set forth in appellants' abstract as follows:

"I am president and general manager of the Wright Construction Company which company is engaged in the paving business. I have been in the paving business for fifteen years, and the principal office of the company is at Des Moines, Iowa. I have laid during those years brick and concrete pavements as well as asphalt work and bitulithic pavement including Warrenite bitulithic. I laid Warrenite bitulithic in the years 1924 and 1925. I have examined the specifications in this case as to the materials which Warren Brothers in their filed agreement agreed to furnish. Those materials are regular commercial materials that can be bought on the market. Their total cost is $.7736 per square yard. I have also made an estimate of the cost on August 16, 1927, of laying this resurfacing job in question after the materials had been put in contractor's wagon by Warren Brothers under their filed agreement, and this estimated cost is 28c per square yard."

Fieweger, the general manager of the Central Engineering Company, testified to the same effect. Likewise Burrows, president and general manager of the Des Moines Asphalt Paving Company. The one fact testified to by these witnesses upon which the charge of fraud is based, is that the original materials entering into the Bitulithic mixtures could be purchased on the market for $.77 per square yard and that the cost to the

contractor of laying the mixture would be approximately $.28 per square yard. The pages of allegation above set forth purporting to describe the alleged fraudulent schemes and purposes of the patentee, have received no other attention in the evidence than has been set forth herein. Upon this testimony of Wright et al., appellants base their argument that the offer of the patentee was *exorbitant*; and if exorbitant, then necessarily fraudulent. The general proposition discussed is that an exorbitant demand by a patentee is necessarily fraudulent because, as patentee, and owner of the patent, he controls such product. The major premise is not supported by the record. The written offer of the patentee to the bidding contractors, as filed with the City Council, obligated the patentee to the performance of the following specifications:

"1. Patents—The right to use any or all the patents, trademarks or trade names now or which may be hereafter owned or controlled by Warren Brothers Company, necessary to lay said pavement.

"2. Materials—All the necessary Warrenite Bitulithic roadway mixtures for the wearing surface having a thickness of two (2) inches after compression, properly prepared in accordance with the specifications and delivered hot in the wagon of the party of the first part or Contractor at a mixing plant located within three (3) miles of the work to be performed. Delivery to begin within fifteen (15) days after receipt of written order.

"3. Advice—An expert, who will give advice as to the building of such pavement, will be furnished to the party of the first part or contractor at the expense of Warren Brothers Company.

"4. Service—Daily examinations of the mixtures as delivered on the street will be made at the Laboratory of Warren Brothers Company; samples to be sent by the party of the first part or Contractor (by parcel post or prepaid express), to the Laboratory of Warren Brothers Company, 38 Charles River Road, Cambridge, Mass.

"5. Price—The price at which all of the above is offered to the party of the first part and to all contractors who make a bid on said pavement, for said street or streets, is:

"One Dollar and thirty-four cents - - - ($1.34) per square

yard of finished pavement, at which price it is also agreed to furnish the materials F. O. B. Muscatine, Iowa, in barrels for reheating and the service for making all repairs, if any, which may be necessaary for the wearing surface during the life of said patents.''

We must assume that the use of the patents had some value in the way of royalty. What would be a reasonable royalty to pay, is a question upon which appellants offered no evidence and upon which the argument makes no suggestion. From No. 2 it will be noted that the materials, which could be purchased in the market for $.77 were to be delivered ''hot in the wagon'' of the contractor within three miles of his work. This process involved some expense to the patentee necessarily. No account thereof was taken in the testimony of the appellants. The same thing is to be said of specifications 3, 4, and 5. No evidence was offered as to the value of any of these items. The defendant, appellee, is under no burden of proof. The burden, both of allegation and of proof, was on the appellants in the court below and is doubly upon them here because of the adverse finding of the district court. They have wholly failed to prove that the price fixed by the patentee was unreasonable in any degree. There is suggestion in argument that the price of $1.35 made by the patentee in its successful bid, is itself evidence that the price of $1.34 was too high. Such bid is no more evidence that $1.34 was too high than it is that $1.35 was too low. The $1.35 bid was not originated by the defendant-company, but by the Central Engineering Company at the first letting, and was manifestly done in hostility to the patentee and without intent to perform. At the second letting the patentee simply reaffirmed the former bid upon its material, which had been dishonored by the maker thereof.

We turn first to a general consideration of the law as relating to paving contracts and to the status of patented articles and patentees in connection with such contract.

II. Section 6004 provides:

''6004. *Bids—notice*. All contracts for the construction or repair of street improvements and for sewers shall be let in the name of the city to the lowest bidder by sealed proposals, upon giving notice by two publications in a newspaper pub-

lished in said city, the first of which shall be not less than fifteen days before the date set for receiving bids, which notice shall state as nearly as practicable the extent of the work, the *kinds of materials* for which bids will be received, when the work shall be done, the terms of payment fixed, and the time the proposals will be acted upon.''

The italicized words ''kinds of materials'' represent an amendment to the statute. In its original form (Section 813, Code, 1897) the statute required the city council to specify a single *kind* of materials and to do so in advance of the bidding. The single selected kind of material became binding upon the bidder as a requisite. The amendment opened up the statute by conferring a large discretion upon the city council, which enables it to put materials in competition at the letting, as well as the bidding contractors themselves. For instance in the case at bar, the city council appears to have selected four materials of the same general class, approximately equal in efficiency and in production cost. It might be advantageous to one proposed bidder to use Lake Asphalt; and to another proposed contractor to use Oil Asphalt; or Amesite; or Bitulithic. Inasmuch as either one would be equally satisfactory to the city council, it became important for each producer of the respective materials to compete in price. The same amendment occurred in Section 5991 relating to resolution of necessity. The city council proposed to accept any one of four materials at the lowest bid to be offered. Neither the resolution of necessity nor the notice to bidders is included in appellants' abstract. But the fair implication of the record before us is that the city council required all bids to be competitive with each other. The bidding contractors had a right to avoid paying profit or royalty to the Bitulithic by resorting to the other materials. So far as appears the other materials could be bought as cheaply as the raw materials entering into the Bitulithic. If the patentee had a margin of $.57 in handling his Bitulithic, as contended, so would any other contractor have a margin of $.57 in handling the other material. If any other contractor had bid $1.34 on any other material, it would have defeated the bid of the patentee. In any event there was no evidence offered that the other material was any better for paving purposes or any more costly in its production than were the raw materials of the Bitulithic.

The materials were of the same class. If their cost was the same, then the other bidding contractors had a clear field of competition and the patented product had no better chance in the competition than the non-patented product. If our statute had not been amended, and if the city council had specified the Bitulithic as a requisite for the bidding, a more plausible cause would be presented for the appellants. But surely where the city council puts four materials of like kind upon equal ground for the purpose of competition, the fact that one of such specified materials is under patent, affords no necessary advantage to the patentee, or disadvantage to the other competitors. Moreover, we are not here concerned with any question of unfair competition.

III. If we are right in the view that appellants have proved no fraud, the discussion might well end there. But the argument of the appellants takes the ground that fraud inheres in the transaction regardless of specific evidence. The trend of the argument is that monopolies, including patents, are odious and that they are contrary to public policy; that therefore the courts will strike them down ruthlessly and will hold the transactions into which they enter as utterly void on grounds of public policy.

The broad condemnation thus projected into the discussion, has heretofore had the very careful consideration of this court in Saunders v. City of Iowa City, 134 Iowa 132. The same patent and the same patentee were involved in that case, that are involved in this one. The same written offer to bidding contractors was filed with the city council, by this same patentee as was filed in the case at bar, except that the price fixed in that offer was $1.45. Much of the argument made by the appellants herein was made by the appellants in that case. It did not occur however to those appellants to contend that the price of $1.45 fixed by the patentee was exorbitant. Under the statute in its then form the city council was required to specify the kind of material in advance of the bidding. The city council did specify the "Bitulithic" as such material. The right to use the Bitulithic therefore became a requisite to the bidder. It was contended that such requisite prevented competition. The ground of attack was that there was no power or jurisdiction in the city council to specify a patented article as a

requisite in the bidding. So much of the general argument made in the case at bar is answered by the opinion of Judge Deemer in the cited case, that we incorporate herein a large part of such opinion.

(141) ''There is a line of cases which broadly hold that where an article is monopolized, no matter whether legally or not, as under a patent, and the statute provides that work of public improvement shall be let to the lowest bidder, such monopolized article cannot be used, for the reasons, first, that monopolies are odious in law, and second, because without free competition there is always opportunity for favoritism, fraud, graft and oppression. The leading case on this subject is Dean v. Charlton, 23 Wis. 590 (99 Am. Dec. 205). This case has been followed in other States. See Siegel v. Chicago, 223 Ill. 428 (79 N. E. 280); Monaghan v. City (Ind. App.), 75 N. E. 33 (Id., 76 N. E. 424); Nicolson v. Painter, 35 Cal. 699; State v. Elizabeth, 35 N. J. Law, 351; Burgess v. City, 21 La. Ann. 143; Fones v. Erb, 54 Ark. 645 (17 S. W. 7, 13 L. R. A. 354); Fineran v. Central Co., 76 S. W. 415 (116 Ky. 495); Smith v. Syracuse Co., 161 N. Y. 484 (55 N. E. 1077); Barber Co. v. Gogreve (Ala.), 5 South. 853; Diamond v. City, 89 Minn. 48 (93 N. W. 912, 61 L. R. A. 448).

''On the other hand, many courts have held that a statute providing that work shall be let to the lowest bidder does not prejudice the use of patented articles. The leading case on this side of the question is Hobart v. Detroit, 17 Mich. 246 (97 Am. Dec. 185), opinion by Cooley, J. This has been followed in State v. Shawnee Co., 57 Kan. 267 (45 Pac. 616); Holmes v. Council, 120 Mich. 226 (79 N. W. 200, 45 L. R. A. 121, 77 Am. St. Rep. 587); In re Dugro, 50 N. Y. 513; Rhodes v. Board, 10 Colo. App. 99 (49 Pac. 430); Swift v. City, 180 Mo. 80 (79 S. W. 172); Mayor v. Flack (Md.), 64 Atl. 702; Field v. Barber Asphalt Co. (C. C.), 117 Fed. 925 (Id. 194 U. S. 618, 24 Sup. Ct. 784, 48 L. Ed. 1142); Bunker v. City (Kan.), 87 Pac. 884; Bye v. Atlantic City (N. J. Sup.), 64 Atl. 1056; Mayor v. Bonnell, 57 N. J. Law, 424 (31 Atl. 408); Schuck v. City, 186 Pa. 248 (40 Atl. 310); City of Raymo, 68 Md. 569 (13 Atl. 383); Yarnald v. Lawrence, 15 Kan. 126, opinion by Brewer, J.; Hastings v. Columbus, 42 Ohio St. 585; Monaghan v. City

(Ind. App.), 76 N. E. 425; Perine v. Quackenbush, 104 Cal. 684 (38 Pac. 533).

''All the cases on either side of this proposition seem to be collected in the valuable notes found in 5 L. R. A. (New Series) 680, and 18 L. R. A. (Old Series) 45. In each of the leading cases above cited there was a strong dissenting opinion, and in view of the decided conflict in the opinions of able courts and judges it is manifest that cogent reasons may be given in support of either conclusion. The Wisconsin court has recently limited the rule announced in Dean v. Charlton to the particular point there decided, and held that cities may contract for the building of patented crematory furnaces, where the contract for doing the work was let to the lowest bidder. Dean v. Charlton was explained, and the conclusions there reached sustained, because the charge was to ·be made upon abutting property, the owners of which had the right to construct the improvement in front of their own properties. See Kilvington v. Superior, 83 Wis. 222 (53 N. W. 487, 18 L. R. A. 45). In this latter case it is said: 'Under any other theory a municipal corporation would be obliged to forego the purchase and use all patented implements, modes, or processes—a result we cannot think the Legislature contemplated.' Under our statutes the abutting owner has no power to construct the pavement himself, and for this there is very good reason. It is important that in the making of such public improvements as street paving there shall be some harmony in design, in wearing qualities, and in contour. A particular kind of pavement for a designated district is less expensive than several kinds for the same district. Again, the kind of material to be used and the method of construction is wisely left to the city council, and its conclusion within proper limits is binding in the absence of fraud or oppression. Where the materials are determined upon and the method of construction fixed, the entire work is done under the direction of public officials, and is made a consistent whole. No abutting owner has power to construct the pavement in front of his lots. He must abide by the decision of the city council so long as it acts within the scope of its authority and is guilty of no fraud or oppression. Other courts holding to the Wisconsin doctrine have been forced to recede from the bold proposition that patented articles cannot be purchased by public boards or officials

where contracts must be let to the lowest bidders. See Perine v. Quackenbush, 104 Cal. 684 (38 Pac. 533) ; Bye v. Atlantic City (N. J. Sup.), 64 Atl. 1056; Mayor v. Bonnell, 57 N. J. Law, 424 (31 Atl. 408). We shall not take the time and space necessary to review the cases which might be cited upon the propositions collaterally and directly involved. It is enough to consider the case as it is presented with reference to its peculiar facts, and to announce a rule which is decisive thereof.

"It must be remembered that the monopoly, in this case, if one exists, was created by the government. It is not one which is odious in the eye of the law, for it was granted by the public as a stimulus to inventive genius, and to preserve to the individual the fruits of his discovery. That thought may be stimulated for the public good, new and useful inventions are patentable, and the discoverer is given the exclusive right to use his invention for a limited period of time. While there are artificial monopolies which are odious in the eye of the law, it seems clear that one created by the government for the purpose of fostering useful discoveries is not such as courts should discredit. Take this case as an example. The patents for paving substances and materials cannot be used for many other purposes. The field for use is limited, and if cities and towns may not avail themselves of new discoveries in this line, little encouragement will be given to invention, and we must depend upon the cobblestones of our forefathers. Surely the Legislature did not intend this result when it made the provision for competitive bidding. It would have been easy to have prohibited the use of patented material in the construction of pavements had the Legislature so willed. As it did not do so, such prohibition should not be inferred from the fact that contracts are to be let to the lowest bidder. What is meant by this statute is that there must be competition where competition is possible. This is the construction usually given to statutes which are not prohibitive in character. If the material, or part of it, is monopolized by patents, there cannot, of course, be absolutely free competition, and where that is impossible, it surely was not the intent of the Legislature that all improvements should cease, or that antiquated methods only should be adopted. All that the law means, as we view it, is that in all cases where competition may exist, such competition shall be allowed by receiv-

ing bids, and in the absence of express prohibition there is nothing to warrant the exclusion of patented articles. The provision as to bidding regulates the exercise of a power and was manifestly not intended to limit it. And neither the public nor the parties benefited by the improvement should be deprived of the best and most approved pavements because full effect cannot be given to an act passed to regulate the exercise of a power expressly granted by other statutes. In other words, the provision as to competitive bidding has reference only to those cases where there may be competitive bidding and not to cases where some of the articles which enter into the work may be in the hands of particular individuals. Courts have never willingly blocked the wheels of progress. They should, and have at all times sought to, encourage and stimulate endeavor and to foster individual initiative, and while a great conservative force in government they do not consciously stand in the way of either mental or material advancement. The statute providing for letting a work of public improvement to the lowest responsible bidder was enacted to secure competition, to prevent fraud and defeat graft. It was enacted to remove as far as possible all favoritism and to secure the performance of public work at the lowest possible price; but it was not intended thereby to impose upon individuals the use of an article simply because it was old, nor to thrust upon the people something that was inferior and antiquated simply because there might be competition as to that, but not in a newer and superior article. The statute does not say that no contract shall be let if there be but one bid, nor that a bid shall be rejected because it includes the use of a patented article. This result is claimed by construction. An elementary rule in the construction of statutes is that they shall be given a reasonable and not an arbitrary interpretation. When this is done, but one result, as we think, can be reached. This is an age of improvement and of progress, and courts should do nothing which will deny municipalities the right to use the most modern methods and improvements unless it is clear that the Legislature so intended.

"There may be a monopoly, natural or artificial, in many of the substances which enter into a pavement. Thus there may be but one bank of sand which is available, or there may be a labor union which fixes the price of all work, or there may

be patented machinery for mixing the cement, and in such cases surely no one would contend that no improvement could be made because, forsooth, no competitive bids may be made. We are well satisfied with the reasoning of Judge Cooley in the Hobart case, supra, and without quoting from his opinion, we adopt the reasoning thereof as being the true solution of the problem. But it is not true that there may not be competition in a patented article. This case is a demonstration that there may be. Competitive bids were received, which were not the same, but varied as above stated. The Warren Bros. Company agreed to furnish its patented material at a flat price to all bidders. The proposition was filed with the city council, and the price named. Bidders knew just what they would have to pay for the material, just as they might have known what they would have to pay for brick, sand, and cement had the pavement been made of brick. We have already set out the proposition, and need not repeat it here. Under the great weight of authority the statute was sufficiently complied with, and there was competitive bidding. See Monaghan v. City; Bye v. Atlantic City, and Hastings v. City, supra; Mayor v. Flack (Md.), 64 Atl. 702; State v. Board, 57 Kan. 267 (45 Pac. 616); Bunker v. City (Kan.), 87 Pac. 884. Quotations from the opinions in these cases are unnecessary as they are readily accessible and fully cover the point here decided.

"The city council adopted the particular pavement after full investigation, and with the best light it could get upon the subject. Its motives are nowhere questioned, nor its purposes challenged. So far as shown, it acted with good business judgment and in full accord with the wishes of a majority of the abutting property owners. There is no claim of fraud and no implication of bad motive, and in our opinion there was all the competition which was necessary to justify the letting of the contract."

The foregoing fully answers the fundamental arguments urged by appellants herein. The alleged illegality of the bids in the Saunders case was predicated upon the same grounds as are presented in appellants' argument except that there was no charge of actual fraud. The fundamental principle is the same in each case. It is urged however by appellants that the patentee was not a bidder in the Saunders case. One of the

propositions of their brief is: "A patentee can not bid." In support of this proposition five cases are cited as authority, and quotations therefrom are made. The quotations relied on in every instance consist of mere dicta; concessions in argument made to the losing party. In every one of the cases thus cited, the *decision* of the court sustained the validity of the bidding. In no case cited was the patentee a bidder. The writer of the opinion in each case takes note of that fact and states that if the patentee were a bidder a different question would be presented. The cases relied on are City of Springfield v. Haydon, 288 S. W. 337 (Ky.); McEwen v. City of Coeur d'Alene, (Idaho) 132 Pac. 308; Burns v. The City of Nashville, (Tenn.) 221 S. W. 828; Sanborn v. City of Boulder, (Colo.) 221 Pac. 1077; Johns v. Pendleton, 133 Pac. 817 (Ore.). In each of the foregoing cases the writer of the opinion impliedly concedes in argument that a patentee may not bid upon his own material. No authorities are cited to such proposition in any one of such opinions. Nor was any claim made that the question was involved directly or indirectly in the case under consideration. Such casual concessions are not *authority*. No *decision* of any court is cited, which has held that a patentee may not bid upon his own material. That the cases on such subject are very rare, is indicated by the fact that the diligent counsel on both sides have been able to find but eight cases where the subject has ever been referred to at all. Three of these cases are cited by the appellee. These cases are LaCoste v. City of New Orleans, 119 La. 469; Litchfield v. City of Bridgeport, 103 Conn. 565; Whitmore, Rauber & Vicinus v. Edgerton, 149 N. Y. Supp. 508.

In the LaCoste case the court said:

"Having to pay this royalty could prevent full and fair competition only if thereby inequality were created between the competitors; and it is argued that inequality is thereby created because the patentee does not have to pay that royalty to himself, and may therefore, either in his own name or through some *alter ego,* underbid his competitors. But that argument is merely specious. To the patentee as to all other bidders, the sole inducement to bid on the contract is the margin of profit which he thinks he sees in it; and no more for him than for anyone else does his royalty enter into that margin of profit. For all others, that margin of profit begins after payment of the royalty·

to him; for him it begins after he has, as it were, paid the royalty to himself. The royalty is assured to him whether he gets the contract or not, and hence does not enter into his margin of profit under the contract. In other words, it is not as patentee that he competes for the contract, but as contractor. As contractor he pays the royalty to himself as patentee, if he secures the contract; precisely as the other contractors would have to pay it if they secured the contract.''

It is true, as appellants point out, that the patentee was not a bidder in that case and that therefore what was said by the court was mere dictum. We may therefore disregard it except as an adequate offset to dicta relied on by the appellants on the same subject. In the other two cases the point was actually *decided*. In the Litchfield case the patentee was a bidder. The court said:

''As regards contracts B & C, the plaintiff observes that while all other bidding contractors were under the burden of making all their profit upon a contract out of the laying of the patented material, the Warren Company had their profit assured in the return from their manufactured, patented product, and hence might forego all profit arising from the laying. The force of this claim is not evident, since the latter company had agreed to sell their product to their bidding competitors at a fixed price, and would presumably have made the same profit had one of these competitors secured the contract and paid the Warren Company for the material.''

In the Whitmore case the court said:

''In this case one of the articles to be used in making the proposed pavement was a patented article, but that had reference merely to the two-inch top coating, and the owners of that patent, themselves bidders for this work, distinctly released their claims under the patent in favor of any person who succeeded in obtaining the contract, agreeing to sell the product which was desired by the property owners and the city authorities at a fixed price. Under the circumstances, there could be and there was competitive bidding, and that is shown by the fact that several bids were received for this improvement under the specifications adopted by the city authorities, *among the*

*bidders being the owners of this patent,* and they were not the lowest bidder; but defendant Holohan was, and he was awarded the contract.''

In the latter case, though the patentee was a bidder, he was not the lowest bidder. It was claimed, however, that his bid invalidated the whole proceeding. It will be seen from the foregoing that only two cases have been cited in either brief where the point raised by the appellants has been actually decided, and such decision is adverse to the appellants.

IV. It is rather important to keep in mind the logical effect of our present statute, as amended, upon the question here under consideration. Under the original statute, the bidder had no privilege of selection of material. The city council was required to select the material in advance. The material selected became a requisite upon the bidder. If patented material were selected by the city council, then the patentee was secure in his profits and had little, if any, motive to project himself into the bidding. This doubtless accounts for the paucity of cases on the subject. The city council was in a position to treat with the patentee before selecting his material and to make requirements of him. It became customary for the city to require an offer to be filed, which should be open without favoritism to all bidders. If the patentee refused to do this, the city council had power to select some other material and to exclude the patented article. Whatever competition was possible had to be directed to the single kind of material.

Under the statute, as now amended, a radically different situation is presented. The city council is empowered thereunder to open the door to competition of materials. If a patented product be included, as one of several materials, no bidder is bound to bid on it. It is not a requisite on the bidder. There is no rule of law which requires a patentee to file his price to the other bidders. This is only a matter of treaty between the patentee and the city council. The patentee in this case did in fact file its written offer. What did it avail him? It did not become a requisite upon any bidder as it would have become if the old statute had been in force. The other bidders had a right to ignore it and they did ignore it. At the first letting the patentee made no bid. The Central Engineering Company put a bid of one cent over and above the cost of the patented pro-

duct. That action has not been explained although the representative of that bidder was a witness adverse to the defendants on the trial. It is quite evident that this Company never intended to perform the bid. It did place, at the same time, a bid upon other material. Under the original statute the bidders would have been compelled to bid upon the patented material, if they bid at all. Under the present statute, they were free from such necessity. At the second letting in August twelve bids were filed and they all related to other materials. No contractor, for whose benefit the written offer had been made, accepted such offer or put a bid upon the material. The patentee could be put in this position at any time by the other contractors, whether in good faith or by collusion. What could he do? What were his rights? He had a right of property in his patent and he was entitled to protect it. His monopoly under his patent was not an odious one as we held in the Saunders case. He had the same right to protect his property and the value of it as any other property owner. His patent was worth nothing to him unless he could sell the patented product. Such product had abundant competition in other materials. Instead of selecting one of them in advance, the city council drew them all into competition. Lake Asphalt was available; Oil Asphalt likewise; and Amesite. They carried no royalty. If the patentee under such circumstances put his bid upon his own material in competition with twelve other bids, who can suggest any other proper course which he could pursue in the protection of his property right? He might have deemed $.25 a square yard a reasonable royalty. Nevertheless he might not be able to get it because of competition of other materials. He had to undersell the other contractors with their other material in order to get the business at all. To withhold his bid, was simply to withdraw his product from the competition. That would have reduced the competition rather than increased it. When, in the absence of other bids on his own material, he put in his own bid in competition with the other material, he instituted a competition, which resulted in a better price for the appellants herein. Ironically perhaps, he adopted the extremely low bid made by the Central Engineering Company at the first letting, made apparently for the very purpose of repudiation and of bringing the material into disfavor. What was there that was

fraudulent in such a course, on his part? Who was, or could be, injured by it, except his competitors? The fundamental argument for the restraints upon patented articles and patentees is that competition must not be throttled. If the patentee had suffered the elimination of his product from the competition, he would to that extent have lessened and throttled the competition. When he put his bid upon his own material, he interfered with no bid of any bidder who was relying on his filed offer, except that his bid was competitive therewith.

Suppose for instance, that each of these four materials had been under patent and that the patentees had all entered the competition, each bidding upon his own material. Could it be said that such bids were unlawful or non-competitive? The logical result of appellants' argument would be to say that they were all under disability and that each bid was nugatory. Pursuant to such logic no bid for patented material could ever be lawfully received except through the medium of a contractor as a middle-man. If under the old statute the patentee had the capacity to contract for his material to be furnished to bidders at his own price, and to do so by private arrangement without public competition, why should he be deemed under disability under the present statute to enter the field of competition against other designated materials?

We emphasize therefore this particular feature of our present amended statute because it renders virtually obsolete the old method whereby the city council designated a single material as a requisite for public building. Under the original statute the selected material was requisite upon the bidder and the price filed by the patentee was likewise obligatory upon him. Under the present statute the only effective method open to the patentee to get his material into the competition, is to bid upon it. His filing of his price to contractors avails him nothing. The contractors are free to ignore it, as in this case they did ignore it.

We note at this point that in the five cases cited and relied on by the appellants, only a single kind of material was involved in the bidding. No choice or option was conferred upon the bidders. They had to bid upon the particular material selected in advance or fail to bid at all.

V. The sum of the situation is that the Legislature has delegated to the city council a large and almost absolute power

in the selection of material for the paving of streets. The power is one to be exercised in good faith and without fraud or favoritism. When so exercised such power becomes the best safeguard that is possible. In such matters the city council sustains a relation of trust to the property owners, who must pay the expense. In this case the city council has so acted. The charge of fraud in the petition is not directed against the council. There is no suggestion of fraud or favoritism on its part. It conceived the idea of putting these materials in competition rather than making a selection in advance. It called for the lowest bid. The method adopted by it naturally eliminated every special advantage which the patentee of a patented product might have, in the event that his product had been selected in advance and made a requisite upon the bidder. To say under the circumstances here presented, that the bid of this patentee tended to throttle competition, is clearly erroneous.

To say that he would have a royalty in the transaction, is something of a fiction. He would have a royalty only to the extent of the price which he could secure for the contract, if he could secure it at all. He could only secure it by presenting the lowest bid. That necessity might take away his royalty and might even involve him in loss. In that respect he would be subject to all the emergencies of the transaction as any other bidder.

The case has the savor of a claim of unfair competition. Manifestly the procedure followed by the city council has resulted in advantage to the property owners. Not one of them claims to have been injured in any respect. Not one of them was a witness in the case. The only witnesses outside of the proof of procedure, were the three competing bidders already named. The testimony of each of them presents the case from the viewpoint of unfair competition between bidders. Appellants have no interest in that direction. As already stated no explanation was offered by the Central Engineering Company of its apparent jockeying at the June letting. The city council was close to the transaction. It was clothed with the power of discretion. It had a right to reject all bids. It acted in good faith. If it had believed that the bid of this patentee operated to the disadvantage of the property owners, it could have rejected the bid.

The plaintiffs have pleaded in great length in paragraph 15, above set forth, that the patentee had favorites and that the favorite failed to make the lowest bid at the June letting; that the patentee refused to extend its customary and expected favors to the low bidder; and that therefore the low bidder, the Central Engineering Company, could not perform its bid, etc. Such allegations were entirely ignored in the taking of evidence. Not a word was offered in support of them. There was no favorite bidder at the June letting. The lone bid was that of the Central Engineering Company. It may have feared that there would be a favorite bidder. That may have been the reason why it bid $1.35 in order to forestall any possible letting upon the Bitulithic material. Its suspicions were groundless then, as the appellants' charges are groundless now.

VI. We have before us then a case where the procedure was perfect. The severe challenge to such procedure set forth in the petition was abandoned at the trial. On the face of the proceedings there was perfect jurisdiction in the city council and every statutory requisite was complied with. There is no statutory provision that discriminates in any degree against patented articles. There is no statutory provision that frowns upon a patentee. If there be any question of public policy involved, as appellants contend, such policy is a legislative one. If it be a doubtful policy to permit patentees to bid at a letting, it was for the Legislature to recognize that fact and to legislate thereon. The possible vice of such a practice is just as manifest to the legislative mind as to the judicial. To base judicial decision upon alleged public policy, has its peril and is done only under extraordinary circumstances. Our legislation purports to cover the whole subject and to make provision for the ordinary contingencies that attend a paving enterprise. Patented articles and patentees have been under observation of the legislative body for these fifty years. It has never occurred to the Legislature in its formulation of laws on the subject to forbid a patentee from bidding on his own material. There is no fraud which a patentee could perpetrate in the exercise of such a right which could not ordinarily be checkmated by the city council in the exercise of its statutory powers. True, city councils may be deceived, and fraud and collusion may be perpetrated without their discovery, but that is a contingency that

is potentially present in every competitive letting. The frauds of collusion are not peculiar to patentees. Nor can it be said that a patentee may more readily deceive a city council than any other contractor. It appears in this record (likewise in many other cases in this court and other courts) that this patentee in the last twenty-five years has laid millions of square yards of paving, and many millions of them in the cities of Iowa. Approximately ten million square yards were laid in this and other States in the year 1927. Its product is generally recognized as a worthy competitor of other materials. Under appellants' contention all these contracts have been, and are, not simply voidable, but absolutely void. Why? Not because any statutory provision was violated; not because any injury was inflicted upon the assessed property owners; not because any fraud was actually perpetrated; but because, as alleged, in some mysterious way fraud *inhered* in the open bidding by a patentee and figuratively burned up his contract. The only basis of argument offered for this conclusion is that a breach of public policy was committed.

Confessedly the written law does not impose disability upon any bidder, nor does it require the city council to reject any bid which complies with the express statutory requirements.

VII. The state of the record before us is not wholly satisfactory. The abstract is in large part a skeleton abstract. The irregularity of procedure charged in the petition, and pressed in the district court, was abandoned on the appeal. The evidence on the subject was therefore omitted from the abstract. Some of the omitted evidence had materiality to the questions which we have discussed herein. For instance the call of the city council for bids, and the form thereof, was necessarily contained in the resolution of necessity and the notice to bidders. These documents were introduced in the court below, but are not included in the abstract here. We assume therefore that the appellants predicate nothing upon the mere form of these proceedings and we presume them to be in such form as would be consistent with the decree of the district court.

Nor does the record before us disclose any of the twelve bids made, other than the successful bid. We assume therefore in support of the decree below, that none of them were lower

than the successful bid; and such is the implication of the argument.

We reach the conclusion upon the record before us that the decree of the district court was proper. It is accordingly affirmed.

MORLING, C. J., and FAVILLE, DE GRAFF, and WAGNER, JJ., concur.

GRIMM, J. (dissenting).—I. I cannot agree with the majority opinion in this case. It is the claim of the defendants (appellees) that inasmuch as there is here no attack made upon the validity of the proceedings on the part of the City Council, therefore, the City Council had jurisdiction in the matter of ordering the improvement and entering into the contract, and that this suit in equity will not lie to question the legality of the contract.

It is the contention of the defendants (appellees) that the procedure set out in Sections 6016, 6029, 6063, and 6065 of the Code is exclusive, and that it was the only remedy open to the appellants in this case.

This court said in Clifton Land Co. v. City of Des Moines, 144 Iowa 625, that:

"Save only in cases where the order or proceedings sought to be enjoined is absolutely void—not voidable merely—it is well settled that a special remedy created by statute is exclusive as to all the controversies coming within its scope, and if a party to whom such remedy is given fails to take advantage of it, he can not resort to equity for relief." Citing many Iowa cases.

In Manning v. City of Ames, 192 Iowa 998, this court said:

"At the outset, we are confronted with the question whether, under the facts of this case, the appellees can maintain this action in equity, or whether they are required to pursue the statutory remedy, by filing objections before the city council, with right of appeal therefrom. If the proceedings were such as to render the assessments absolutely void, then a court of equity has the power to enjoin the collection of such void assessment. Such have been our repeated holdings. Chicago, M. & St. P. R. Co. v. Phillips, 111 Iowa 377; Fort Dodge E. L. & P. Co. v. City of Fort Dodge, 115 Iowa 568; Davenport Loco-

motive Works v. City of Davenport, 185 Iowa 151; Shaver v. Turner Impr. Co., 155 Iowa 492; Nixon v. City of Burlington, 141 Iowa 316; Dunker v. City of Des Moines, 156 Iowa 292; In re Appeal of Apple, 161 Iowa 314; Spalti v. Town of Oakland, 179 Iowa 59; Polk v. McCartney, 104 Iowa 567.''

In Tjaden v. Town of Wellsburg, 197 Iowa 1292, this court said:

"We have recognized two methods by which the validity of an assessment of this character (sewer assessment) may be tested. One remedy is by objections before the council, as provided by Code Section 824 (Section 6029, Code of 1927), with the right of appeal therefrom, under Code Section 839 (Section 6063, Code of 1927). * * * The other method, that of attacking an assessment by suit for injunctive relief, where fraud is shown, or where it is established that the proceedings are wholly and absolutely void, has also been recognized. The respective remedies, and when they are available to the taxpayer, are discussed in Owens v. City of Marion, 127 Iowa 469; Clifton Land Co. v. City of Des Moines, 144 Iowa 625; Durst v. City of Des Moines, 164 Iowa 82; Ellyson v. City of Des Moines, 179 Iowa 882; Manning v. City of Ames, 192 Iowa 998.''

In Owens v. City of Marion, supra, this court said:

"It goes without saying that, if the assessment was without any authority, plaintiff was not bound to file objections with the council, or to appeal from its action in the premises. Ft. Dodge v. Ft. Dodge, 115 Iowa 568. But if irregular, unequal, or erroneous simply, then, as a tribunal is provided for the correction thereof, plaintiff must resort to this tribunal.''

It is unnecessary to here analyze the many cases cited by the appellee. It will be found, upon close examination, that they all involve irregularities of one sort or another, and in no case has it been held that if the contract under which an assessment is sought to be made and enforced, is *illegal*, that then the interested party is prevented from proceeding in equity and the remedy by objections before the City Council and appeal is exclusive. Neither has it been held that the payment of public funds created by taxation cannot, under such circumstances, be enjoined by an action in equity, and the complainant

is confined to the statutory procedure of filing objections and appeal. Manifestly, this case should be decided against the appellee on this particular contention.

II. Is the contract involved in this case illegal? Section 6004 of Code of 1927 provides, among other things, as follows:

"All contracts for the construction or repair of street improvements and for sewers shall be let in the name of the city to the *lowest bidder* by sealed proposals." (Quoter's italics.)

The purpose of the statute has been expressed by this court in Saunders v. City of Iowa City, 134 Iowa 132, as follows:

"The statute providing for letting a work of public improvement to the lowest responsible bidder was enacted to secure competition, to prevent fraud and defeat graft. It was enacted to remove as far as possible *all favoritism* and to secure the performance of public work at the lowest possible price." (Quoter's italics.)

Again this court said, in commenting on the statute, in Atkinson v. City, 177 Iowa 659:

"The object of such provisions is to prevent favoritism, corruption, extravagance and improvidence in the awarding of municipal contracts, and they should be so administered and construed as to fairly and reasonably accomplish such purpose."

See also McQuillin on Municipal Corporations, 2d Ed., Vol. 3, Section 1286. This eminent writer, among other things, says, in reference to such statutory provision:

"These provisions are strictly construed by the courts, and will not be extended beyond their reasonable purport."

In Plagmann v. City of Davenport, 181 Iowa 1212, a suit in equity to enjoin the collection of special assessment for the cost of paving, this court said:

"Fraud, as used in this connection, has reference to conduct, words or representations which partake in some material degree of artifice or deception employed to deceive, cheat or circumvent another; it is some form of deception consciously employed for the purpose of misleading another."

This court has also said in Dickinson v. Stevenson, 142 Iowa 567:

"'Fraud in a court of equity properly includes all acts, omissions and concealments which involve a breach of either a legal or equitable duty, trust or confidence justly reposed and are injurious to another or by which an undue or unconscientious advantage is taken of another.'"

In the case at bar the defendant company had a monopoly as a patentee. The materials used are ordinary, common materials that can be bought on the market by any one. By the testimony of competent witnesses on the trial, it appears that the cost of these ingredients at the time in question was about 77 cents per square yard of pavement. Having filed a price to all bidders of $1.34 per square yard, it is apparent that the defendant company gave a price to contractors of 57 cents per square yard more than the cost of the material. It was entitled to compensation for the use of its monopoly. The record clearly shows that the cost of laying the materials, after the fully prepared product was placed in the contractor's trucks, was about 27 or 28 cents per square yard. For doing this work the defendant company charged in its bid only one cent per square yard.

There is nothing in the record which warrants the inference that the defendant company intended to donate its services in the laying of this paving. There is no showing of advantage to them in so doing. They were not introducing a new product nor were they introducing a new method of performing contracts. The only reasonable and practical inference which can be drawn from the foregoing figures is that, under the guise of a reasonable patentee's royalty, the defendant company was in fact adding to the reasonable patentee's royalty, substantially the entire cost of laying the paving, after the prepared material was placed in the contractor's trucks. True enough, the patentee could charge any price for his monopoly which he saw fit. He was under no obligation to sell it to the city at all, but the method adopted partakes "in some material degree of artifice or deception employed to deceive, consciously employed for the purpose of misleading another."

Was there competitive bidding in this case, as is required

by the statute, or was there a mere showing or pretense of competition? Manifestly, had the defendant company not been a bidder, all other bidders would have been competitive because they would all have been upon substantially an equal basis and upon an equal basis as to materials and patented process. Every contractor would have started with the basic price of $1.34 per yard. Each contractor would then compete, one with all the others, in the matter of the cost of handling and laying the prepared material. Into this would enter various elements of equipment, labor costs, management, overhead, insurance, and other similar questions. Under some circumstances, one contractor might reasonably be expected to be able, with a reasonable profit, to lay this material in accordance with requirements for, as for illustration, 25 cents per square yard, while another contractor, because of limitations of equipment or other elements entering into the total cost, could not lay the same, including a reasonable amount of profit, for less than perhaps 30 cents per square yard. It is very apparent, however, that no one could compete with the defendant company on the basis of one cent per square yard. No witness testified to a cost of less than 27 cents per square yard for laying the prepared material. It is utterly unreasonable to conclude that, whatever may have been its equipment or its labor and overhead costs, or what not, it could lay this prepared product on the streets of Muscatine for one cent per square yard. It is not claimed by the defendants that they could do this work for less than 27 cents per square yard.

In its final analysis, permitting the patentee to bid enables him, if he sees fit so to do, to eliminate competition. To do so is illegal. In this case the patentee was permitted to add his price of one cent per square yard for laying the pavement to the price given to the bidders for the prepared material. This was a mere sham and deception. There was no competition in the procurement of the contract at bar and it is illegal.

To hold that there was competition in letting this contract would be, by judicial fiat, to abrogate the statute. It would be trifling with legislative intention and enactment.

With the knowledge on the part of the patentee that he is to be permitted to bid, and knowing full well that, by raising his general price to all contractors to the point where he can afford not only to furnish the materials and the use of his patent,

but likewise to do the work, he is thus given the opportunity to absolutely eliminate all competition in so far as doing the work or laying the material is concerned. The whole scheme of thus including in his price to contractors his profit for doing the work, or a very large portion thereof at least, is in the nature of a fraud upon those who are entitled to protection under the statute by competitive bidding among the contractors who are to lay the material on the streets in the form of a completed paving.

Under the guise of competition the defendant company, in fact, exercised an absolute monopoly, not only in the matter of its patent, but also in the matter of laying the materials under its patent on the streets of Muscatine. There were four different kinds of material specified and competitive bids taken on each of them. When the City Council selected Warrenite Bitulithic, all other materials passed out of the picture. Competition among materials is not sufficient. There must be competition on the material selected. After the selection of Warrenite Bitulithic was there competition in the bidding on that material?

This court has already made some significant statements pertaining to this general subject.

In Miller v. Oelwein, 155 Iowa 706, the notice to bidders called for bids on bitulithic pavement. One of the bidders (Ford), whose bid was low, bid on "bitulithic or its equal pavement." The council rejected this bid and awarded the work to the next higher bidder. The property owner brought an action to enjoin the defendant city and its officers from entering into the contract. The lower court granted the injunction and this court affirmed it. In so doing, it said:

"The result of the council's action was to avoid the acceptance by it of Ford's bid as the lowest and the necessary acceptance of a higher bid by intervener, the only other bidder. This was evidently in its result a *fraud on the property owners*, for it compelled them to pay a higher rate for the pavement ordered. No doubt, the council had authority to accept intervener's bid as the lowest if there was no other bid proper for their consideration (Dubbert v. Cedar Falls, 149 Iowa 489; Saunders v. Iowa City, 134 Iowa 132); but the council committed a legal wrong in rejecting Ford's bid without reasonable ground

for doing so, and thus putting them in the position of being bound to accept a higher bid or postpone the letting of the contract.'' (Quoter's italics.)

In McMullen v. Hoffman, 174 U. S. 639, this court said:

''It is not too much to say that the most perfect good faith is called for on the part of bidders at these public lettings, so far as concerns their position relating to the bids put in by them or in their interest. The making of fictitious bids under the circumstances detailed herein is in its essence an illegal and most improper act; indeed, it is a plain fraud, perpetrated in the effort to obtain the desired result.''

In the McMullen case, prior to making their bids, two contractors entered into an agreement under the terms of which they agreed that if either one of them got the work, the profits resulting therefrom should be shared between them.

This question has been before several of our courts of last resort. In fact many courts have held that where an article is monopolized, no matter whether legally or not, as under a patent, and the statute provides that work of public improvement shall be let to the lowest bidder, such monopolized article cannot be used, for the reasons, first, that monopolies are odious in law, and second, because without free competition there is always opportunity for favoritism, fraud, graft and oppression. This court has, however, in Saunders v. City of Iowa City, 134 Iowa 132, settled that question in this state in favor of the monopolized article. It will be noted, however, that in the Saunders case Warren Brothers, who were the owners of the patent, *did not bid* at the letting. This court said:

''But it is not true that there may not be competition in a patented article. This case is a demonstration that there may be. Competitive bids were received, which were not the same, but varied as above stated. The Warren Bros. Company agreed to furnish its patented material at a flat price to all bidders. The proposition was filed with the city council, and the price named. Bidders knew just what they would have to pay for the material, just as they might have known what they would have to pay for brick, sand, and cement had the pavement been made of brick. * * * There is no claim of fraud and no im-

plication of bad motive, and in our opinion there was all the competition which was necessary to justify the letting of the contract.''

This court has said in Johnson County Savings Bank v. City of Creston, 212 Iowa 929, that:

''It is a general principle that a municipal contract entered into in violation of a mandatory statute, or a contract in opposition to public policy, is not merely voidable but void (Coggeshall v. Des Moines, 78 Iowa 235), and that no contract for services rendered or goods furnished pursuant thereto can be implied, nor may the acceptance of benefits thereunder be made the basis of a liability by estoppel. Reichard v. Warren County, 31 Iowa 381; Cedar Rapids Water Co. v. Cedar Rapids, 118 Iowa 234, 253; Langan v. Sankey, 55 Iowa 52, 54; Barngrover v. Pettigrew, 128 Iowa 533; Cole v. Brown-Hurley Co., 139 Iowa 487; McPherson v. Foster Bros., 43 Iowa 48; Citizens' Bank v. Spencer, 126 Iowa 101, 105; Iowa Electric Co. v. Winthrop, 198 Iowa 196, 201; Stropes v. Board of Commissioners, 72 Ind. 42; Peck-Williamson Co. v. Steen School Township, 66 N. E. (Ind.) 909; Worrell Mfg. Co. v. Ashland, 167 S. W. (Ky.) 922; Eaton v. Shiawassee County, 218 Fed. 588; Van Buren Light & Power Co. v. Inhabitants of Van Buren, 109 Atl. 3, 118 Me. 458; 43 C. J. 248; 44 C. J. 120, 138; 3 McQuill. Mun. Corp., Section 1164; Strickler v. Consolidated School District, 291 S. W. (Mo.) 136; Carter v. Reynolds County, 288 S. W. (Mo.) 48; Carter v. Bradley County Road Improvement District, 246 S. W. 9, 155 Ark. 288; Gaddis v. Barton School Township, 164 N. E. (Ind.) 499. * * * A municipal contract let without competitive bidding when the statute requires competitive bidding, is void, and no recovery may be had either upon the purported express contract or upon an implied contract to pay the reasonable value of the services or material furnished thereunder. Weitz v. Independent District, 79 Iowa 423; Zottman v. San Francisco, 20 Cal. 96; 81 Am. Dec. 96; Brady v. Mayor, 16 How. Pr. (N. Y.) 432; (see discussion of these cases in Reichard v. Warren County, 31 Iowa 381). Reams v. Cooley, 152 Pac. (Cal.) 293; Dickinson v. Poughkeepsie, 75 N. Y. 65; Cawker v. Central Bitulithic Paving Co., 121 N. W. 888, 140 Wis. 25; Richardson v. Grant County, 27 Fed. 495; Bristol v. Dominion

National Bank, 149 S. E. (Va.) 632; Springfield Milling Co. v. Lane County, 5 Ore. 265; Detroit v. Robinson, 38 Mich. 108; Twohy Bros. Co. v. Ochoco Irr. Dist., 210 Pac. (Ore.) 873; Nellis v. Minton, 216 Pac. (Okla.) 147, 149; People v. Gleason, 25 N. E. (N. Y.) 4; McDonald v. Mayor, 68 N. Y. 23; Wagner v. Milwaukee, 220 N. W. (Wis.) 207; 19 R. C. L. 1068; Strauch v. San Mateo, 286 Pac. (Cal.) 173; 44 C. J. 136; 43 C. J. 248; 3 McQuil. Mun. Corp., Section 1196, 1st Ed.; Id., 2nd Ed., Section 1283.''

In McEwen v. City of Coeur d'Alene, 132 Pac. 308 (Ida.), that court said:

''It clearly appears in this case that the patented invention for the manufacture and use of the bitulithic process was issued to Warren Bros. Company, and that such patentee agreed to allow the use of the patented mode and material at a specified price per square yard by any one bidding upon the contract. The proposal for bids afforded competition by reason of the fact that many things were to be done, in connection with the contract and its fulfillment, in addition to the furnishing of the bitulithic process. *There is no evidence that the Warren Bros. Company were bidders for such contract, or that the Warren Construction Company had any interest whatever in the patent of the bitulithic process*; and it not being shown that Warren Bros. Company, the owner of the patent process, had any interest whatever in the bid made by the Warren Construction Company, which was accepted by the City, this court is not justified in concluding that competitive bidding was prevented in any way whatever.

''There can be no question but that the authorities relied upon and cited by the respondents are not applicable to the facts in this case and the statute which we have heretofore discussed. *It would be a very different question, and one which seems to be recognized in the authorities above cited in support of the position contended for in this case by the respondents, if the Warren Bros. Company, the patentee of the bitulithic process, was a bidder, but the facts do not support such contention.* In this case the Warren Bros. Company, the patentee, filed an agreement to allow the use of the patented process at a specified price by any one bidding upon the proposal, and

who made a contract with the City of Coeur d'Alene for the construction of bitulithic pavement. The only rule to be adopted by this court, under the facts, is the rule heretofore announced and approved in the cases heretofore cited."

In a concurring opinion, Sullivan, J., said:

"If it appear from the record that Warren Bros. Company, the owner of said patent, had any interest whatever in the bid which was accepted by the city, the city authorities should be enjoined from proceeding under said contract. The owner of a patented paving material is not permitted to bid, or to have any interest in a bid, for paving a street, under the laws of this state. If he were allowed to do so, there would be no real competition in the bids; for if the owner of the patent agreed to furnish the patented material to any one bidding for the contract, say, at $2 per square yard, and then bid for the contract at $2 per square yard there would be no competition, and could be none, in the matter. But where each bidder can procure the patented material on the same terms, and the owner of the patent is not permitted to bid, nor to have any interest in any bid whatever, for the paving of the street, then there would be legitimate competition. But, as the point is not made on this appeal that the owners of the patent have any interest in the bid, I concur in the conclusion reached by Mr. Justice Stewart."

In Sanborn v. City of Boulder, 221 Pac. 1077 (Colo.), that court said:

"* * * where, as in the case at bar, the owner of the patented pavement has filed with the City Council a binding agreement that it will furnish the pavement in question to all persons alike upon precisely the same terms and at the same cost, *and is itself not a bidder*, it has been held by the majority of the courts in this country not to make the specifications of a City Council in selecting the patented pavement, repugnant to the provision of a statute, or a charter, or an ordinance requiring competitive bidding."

In Burns v. The City of Nashville, 221 S. W. 828 (Tenn.), that court said:

"While there is some conflict of authority upon the question of the right of the officers of a municipality to prescribe a patented material for street paving under a statute or charter requiring competitive bidding, the great weight of the more recent authorities is in favor of such right, *where the owner of the patent does not himself bid for the contract,* but makes an offer to furnish the patented material or mixture for a stipulated price, on equal terms to all bidders." (Quoter's italics.)

In City of Springfield v. Haydon, 288 S. W. 337 (Ky.), a case in which while the question of the right of a patentee to bid was not involved, nevertheless that court used some significant language on the subject, as follows:

"When a certain rock is known to be good, no risk is taken in requiring its use. Competitive bidding must not be destroyed or impaired. But, if there may be free and fair competitive bidding when a certain rock is required, the City Council may, if it thinks best, take no risks and require the use of the known material. In this case the Kentucky Rock Asphalt Company had been getting out rock for a number of years. With this rock a number of streets and roads in this and other states had been built. *The company was not in the construction business.* It simply got out its rock and sold it upon the market. *It had no interest in the bids or in the work.* Three responsible bids were made. To hold that there was a substantial denial of competitive bidding here is for the court to shut its eyes to the facts.

"This case is entirely unlike Fineran v. Central Bitulithic Paving Co., 116 Ky. 495, 76 S. W. 415, 25 Ky. Law Rep. 876, 3 Ann. Cas. 741. In that case the company alone made the material of which the street was built. It not only made the material, but it was in the business of constructing streets. It was one of the bidders for the contract, and got the contract to construct the street out of the material which it alone manufactured, and which no other bidder could get except from it. *Under such circumstances there could reasonably be no real competitive bidding, and the ordinance was therefore held void.*" (Quoter's italics).

See, also, Johns v. Pendleton, 133 Pac. 817 (Ore.).

902

Appellees cite in support of their position the following cases:

LaCoste v. City of New Orleans, 119 La. 469; Litchfield v. City of Bridgeport, 103 Conn. 565; Whitmore, Rauber & Vicinus v. Edgerton, 149 N. Y. Supp. 508.

The theory of the said three cases cited by appellee is, in substance, the patentee, if he becomes a bidder, must, by first paying his royalty to himself, stand upon the same fundamental basis with all contractors in competition, that is to say: he is in competition with all other contractors on the amount of his bid over and above the basic price made to all contractors alike. (In one of these cases, Whitmore, Rauber & Vicinus v. Edgerton, 149 N. Y. Supp. 508, the patentee was not the lowest bidder.) Such a situation would have been impossible under the facts in the case at bar. No contractor could compete with the bid of one cent for doing 28 cents worth of work. What was done in the instant case is eloquently illustrative of the vice of the rule of permitting the patentee to bid. When the patentee is permitted to bid, the law places in his hands, not only a monopoly on the patented article, but, if he chooses to use it, an equally secure monopoly upon the laying of the patented article on the streets. The contract at bar is, on its facts, under the law of Iowa, illegal. I think the case should be reversed.

STEVENS, ALBERT, and KINDIG, JJ., join in this dissent.